# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

**Toninna Lamanna,**

     *Plaintiff,*

**v.**              **Case No. 3:16-cv-409**
                **Judge Thomas M. Rose**

**City of Dayton Police Department,**

     *Defendant.*

---

**ENTRY AND ORDER GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT. ECF 16. SUMMARY JUDGMENT IS AWARDED ON PLAINTIFF'S CLAIMS UNDER FEDERAL LAW. THE COURT DECLINES TO EXERCISE JURISDICTION OVER PLAINTIFF'S STATE LAW CLAIMS, WHICH ARE DISMISSED WITHOUT PREJUDICE, AND TERMINATES THE INSTANT CASE.**

---

Pending before the Court is Defendant's Motion for Summary Judgment. ECF 16. Therein, Defendant, City of Dayton Police Department, requests that the Court grant summary judgment on Plaintiff Toninna Lamanna's claims of gender discrimination. Defendant's motion will be granted.

## I.  Background

In 2010 Plaintiff Toninna Lamanna, a ten-year veteran of the Dayton Police Department applied for a position as a K-9 officer. During the interview she claims she was asked inappropriate gender-related questions. When Lamanna complained of discrimination in the

application process Human Resources Analyst Maurice Evans reviewed her complaint. (ECF 18 at 21). After Evans reviewed the results, he offered Lamanna the K-9 position by email. Evans felt Lamanna was the most qualified for the position. (Id. at 46).

Soon after sending the email, Evans sent a second email retracting the position because "the chief stepped in." (Id. at 46). According to Evans, the decision of who was to be awarded the K-9 position was within the sole discretion of Police Chief Richard Biehl. (Id. at 47). There was another officer, Dan Reynolds, a white male, who was also in the running for the K-9 position. Evans met with Lamanna and Reynolds, telling them that, since there was only one K-9 position available, Lamanna would get the first position and when another position became available Reynolds would get the next K-9 position. Reynolds was upset about this decision and filed his own charge with the EEOC.

After Evans made his recommendation for the K-9, things became "convoluted." There were hearings and emails and discussions about what to do with the K-9 position. (Id. at 49). At one of the hearings, Evans heard Chief Biehl say that Lamanna was "the most qualified person" for the position. (Id. at 50). Even after Chief Biehl admitted that Lamanna was the most qualified, he still did not agree to give her the dog. (Id. at 50). However, Deputy Chief Wanda Smith protested this and eventually Lamanna was awarded the K-9 through a Conciliation Agreement with the Ohio Civil Right Commission dated January 24, 2011.

Under the terms of the Conciliation Agreement, both parties agreed that Lamanna would transfer to day shift, and both parties agreed that "Charging Party [Lamanna] will be placed in a daytime K-9 position for a period of five (5) years." (ECF 22, Exhibit 1).

Theresa Hinders was an HR Analyst with the City of Dayton just after Lamanna was placed into the Canine Officer position. (ECF 29, ¶¶ 2, 6).   She witnessed the City take "an abnormally long amount of time to assign [Lamanna] a dog."   She heard officers make jokes about Lamanna due to her height. (Id. at ¶ 8).   She also heard Chief Biehl state during a hearing that Lamanna "wants all this special treatment" and that he was "not going to make an exception for her [Lamanna]". (Id. at ¶ 13).   Chief Biehl also said in front of Hinders that Lamanna had "caused too many problems already." (Id. at ¶ 14).

After the Conciliation Agreement was signed and Lamanna completed her training with her dog, Lamanna asserts other canine officers, namely Cleaver, Zweisler and Lally, interfered with Lamanna's training of her K-9 so much that her dog failed the certifications and she had to go back to school to get retrained. (ECF 17-1, at 110).   The other handlers lied to Lamanna and told her that her dog was off the track, when the dog was actually on the correct track.   This caused Lamanna's canine to doubt her abilities and suffer so much that Lamanna and her dog both had to go back to school to get retrained.   Lamanna alleges that the other canine officers never wanted her on the unit, and this led to their unfair treatment of her canine. (ECF17-1 at 112).

During another training incident, airport K-9 Sergeant Theodore Priest witnessed what he referred to as the other officers "setting her [Lamanna] up for failure" because the senior officers were not following commonly known techniques in testing and training their K-9s. (ECF 20, at 17).

Lamanna's attorney wrote a letter to the City's legal department complaining of continued harassment from her fellow K-9 Officers on September 19, 2011. (ECF 28, ¶ 6).   The City responded by proposing that they transfer Lamanna over to the airport to work there with her K-9

instead of as a normal patrol K-9. Lamanna declined the transfer, believing this would affect her canine certification she had just worked so hard to receive. (Id. at ¶ 10, Exhibit 2). There was no further communication between Lamanna or her attorney and the City about the issues she raised.

Lamanna continued complaining about issues in the K-9 Unit. Lamanna complained to Maurice Evans five to ten times over the course of the five years that she was a K-9 Officer. (ECF 18, at 36-37). According to Evans, a lot of Lamanna's complaints came after Lt. Eric Sheldon became her K-9 Supervisor. Lt. Sheldon did not become Lamanna's supervisor until March of 2014. (Id. at 38). Sometimes Evans did nothing in response to the Complaints, sometimes he told the Human Resources Director, and sometimes he brought the issues up with the Law Director. (Id.).

A few of Lamanna's complaints caused concern for Evans. One time, Lamanna complained that she had a bad tire on her squad car. Evans told her to get a stipend for getting the tire fixed, but Lamanna explained that her Sergeant at the time would not approve her stipend and told her to just "monitor" the tire while she was driving on it back and forth to Fort Wayne, Indiana. Evans testified that the issue with the tire bothered him so much that he called her every Friday while she was on the road, just to make sure she was "ok." (Id. at 40).

Other complaints that Evans received included: that Lamanna's Sergeant office was in a "closet" (Id. at 42); that she was denied training (Id. at 43); that she was denied the initial promotion to Sergeant (Id. at 44); that she was forced to take her pants down in the bathroom in front of Lt. Wendy Stivers (Id. at 61); and that she was required to use different leave policies than other officers (Id. at 61).

Lamanna scored the highest score on the Police Sergeant Civil Service examination conducted on October 16, 2014. (ECF 21, Exhibit 5).   She was the only examinee to score above 90; second place was over three points behind her at 87.   Maurice Evans, a Human Resources Analyst who is also the Chief Examiner for the City of Dayton, oversaw the exam.   According to Evans, officers and sergeants are to be promoted based on how they rank on the Civil Service examine, "if you're the first one, then you go [get promoted] first, second, third, that way.   And after you're a sergeant for probably five years, then you take the lieutenant's test.   And it goes the same thing." (Id. at 8).

Evans testified that even though Lamanna placed first on the 2014 Sergeant Civil Service Exam, she was not promoted first from the list.   According to Evans, Plaintiff was not promoted off the list at the direct request of Chief Biehl for a waiver to not promote her:

Q: So the chief asked for the waiver?

A. Yes.

Q. Did he ask you directly?

A. Yes.

Q. Had he ever asked for a waiver for anybody else?

A. No.

(Id. at 13).   According to Evans, there was a dispute between Lamanna and her attorney about whether she should be required to file for a waiver.   Lamanna acknowledged that there was a five-year agreement to work in the K-9 position but expressed concerns at a board meeting that there were other officers that had not fulfilled standard time-in-position commitments but were still getting promoted off the same list. (Id. at 16).   According to Evans, the City did not investigate

5

that issue during the board meeting and Evans did not verify any of the issues Lamanna raised "until later." (Id.). Evans attended the promotion of one of the other males that was promoted from the list, Sergeant Richard Taylor. Sergeant Taylor placed third on the October 16, 2014 Civil Service examination, but he was promoted ahead of Lamanna. (Id. at 17).

Sergeant Richard Taylor testified that prior to taking the October 2014 Civil Service examination, he was a Detective with the Special Victims Unit ("SVU"). His first day with the SVU was January 2, 2012 and his last day there was May 21, 2013. (ECF21, at 17). The SVU has a time commitment of three years. (Id. at 19). Sergeant Taylor left the SVU after completing less than half of the time commitment for a position as a Computer Forensic Examiner. Sergeant Taylor was at first told he would not be able to transfer to the Computer Forensic position because the department was "now holding people to their commitment." However, Sergeant Taylor noted that the general operation in the City was that people moved around from their commitments if other opportunities arose: "people would move…you stay here or whatever, and if opportunities come up…people would move." (Id. at 27). Sergeant Taylor simply submitted a request to Chief Biehl, and he was permitted to break his time commitment to the SVU and was offered the position as the Computer Forensic Examiner. (Id.).

According to the posting for the Computer Forensic Examiner, this job also required a time commitment. The position was supported by the FBI and part of the requirements were to obtain a special FBI certification. To qualify for the position, the applicant had to agree "to work in the position for two years upon completion of certification. Certification normally takes 12 to 18 months to complete." (ECF22, Exhibit 3). Nothing in the posting indicated that the position

would end if the FBI withdrew its support or that the commitment was contingent upon FBI support.

Sergeant Taylor started working in the Computer Forensic position and began his training to get the special certification needed in May 2013. However, in May 2014, the FBI announced it would be withdrawing its support of the lab where Sergeant Taylor was working. Sergeant Taylor stayed in the lab without the FBI support for a few more months, still "doing support for child exploitation crimes" and other forensic work. He did not have the equipment that came with the FBI support, but he managed to find work to do as there was no other Computer Forensic Examiner for the entire City of Dayton. (Id. at 43). He noted that he was "always busy…there weren't days of just sitting around not doing anything, there was always something to do." (Id. at 44).

In October 2014, Sergeant Taylor took the Sergeant's exam. He was promoted from this list before he had completed his two-year commitment to the Computer Forensic Examiner position.

Lamanna was placed with a new K-9 Administrative Sergeant, Eric Sheldon from March 2014 to August 2016. (ECF 24, at 10). Almost immediately upon his appointment, Sheldon began to make changes in the K-9 Unit's leave policies during mandatory training days. (ECF 24, at 36). Sheldon admitted that, prior to him taking over the unit, there was no policy in place for requesting leave during mandatory training days. (Id.). However, when Lamanna requested leave during a mandatory training day, Lt. Sheldon responded in an email to his command staff.

On March 28, 2014, Lamanna's "regular" supervisor, Sergeant Abney, approved her for vacation time for a mandatory canine training day previously set for April 23, 2014. Without

knowing exactly the policy for leave requests, Sergeant Sheldon authored an email to his entire Command Staff. In the email, Sergeant Sheldon questioned Lamanna's truthfulness and character. He said that Lamanna had "ironically" requested a vacation day the same day that Sergeant Sheldon had started implementing night training days and Lamanna was "less than enthusiastic" about the night training. Sergeant Sheldon then notified Sergeant Abney that the vacation was going to be denied. (ECF 24, Exhibit 12). Lamanna asserts she had never expressed to Lt. Sheldon that she did not want to do night training; but that this was a rumor that Lt. Sheldon had heard from the other handlers. (Id. at 52). According to Lt Sheldon, a lot of people in the Department were upset with Lamanna because she was permitted to work day shift as part of the Conciliation Agreement and the other Canine Officers had requested night-time training to coincide with their own work hours instead of with Lamanna's day time hours. (Id.).

Lamanna explained to Sergeant Sheldon that she had requested the vacation day because she was having a medical procedure done and wanted to use her vacation time since she had an abundance of vacation time and did not want to use her sick leave. Sergeant Sheldon then forced Lamanna to provide a doctor's note for the sick leave. Lamanna produced the note.

After April 2014 when Sergeant Sheldon made it clear that only "pre-approved" vacation and sick leave with doctor's notes could be used on mandatory training days other male officers continued to use other types of leave on mandatory training days. On May 14, 2014, Daniel Reynolds used .33 hours of CMP (comp) time. On July 23, 2014, Theodore Trupp used 8 hours of FUL (funeral) leave. On February 24, 2016, Daniel Reynolds used 5 hours of vacation time, and used one hour of vacation time on March 23, 2016. Christopher Savage used a total of 20 hours of comp time on July 27 and October 26, 2016. Robert Cleaver used 5 hours of comp time

on July 26, 2017 and Christopher Savage used 2.17 hours of comp time on August 9, 2017. (ECF 24, Exhibit 11).

Lt. Sheldon testified in his deposition that he "absolutely" did not think that Lamanna was a team player and that she was pretty "secretive" about her life. However, he was unable to cite to any specific examples. During his deposition, Lt. Sheldon also testified that he saw some problems with how Lamanna handled her K-9, but the only evidence he provided to support those assertions were statements that he said were told to him by Robert Cleaver. (ECF 24, at 34). Cleaver is one of the K-9 Officers who was in Lamanna's initial K-9 Officer interview and one of the officers that Lamanna was referencing about harassment in her September 2011 letter to the City of Dayton legal department.

Lt. Sheldon even went as far as to check on Lamanna by visiting a post office where Lamanna frequently visited for package sniffs with her dog. Susan McDonough was the United States Postal Inspector at the time and she testified via affidavit that she had known and worked with Lamanna for several years when Lamanna's K-9 supervisor surprised McDonough by showing up at McDonough's work and questioning her about whether Lamanna was actually coming into the post office. McDonough had high praises for Lamanna and explained to Lt. Sheldon how valuable Lamanna's assistance was. (ECF 27, ¶¶ 6-10). McDonough regaled the incident as "odd" because she had worked in the post office for many years and no one had ever come to her to "check up" on an officer before. (Id. at ¶13).

In approximately July of 2015, Lamanna was doing some night-time training with her other K-9 Officers and with Lt. Sheldon. During the training, Officer Cleaver came to Lt. Sheldon. According to Lt. Sheldon, Officer Cleaver told him that "Lamanna got bit by her dog, and she was

holding her leg and screaming and that she was going to have to go to the hospital" and Cleaver made a "big deal" out of the incident.   Lt. Sheldon approached Lamanna, and Lamanna told him that she did not get bit by her dog. (ECF 24, at 70).   Lt. Sheldon chose to call a female Officer, Lt. Wendy Stiver, to examine Lamanna under her clothes in the locker room. (Id. at 71).   Lt. Sheldon made Lamanna go into the locker room with a female[1] and forced Lamanna to pull her pants down to check for bite marks while Stivers took photos.   No bite marks were found. (Id. at 71)

When an officer leaves a K-9 position, the dogs normally retire with them.   Lamanna's dog was retiring in 2016 as Lamanna was being promoted to Sergeant.   Around this same time, Lt. Sheldon implemented an overhaul of the K-9 Standard Operation Procedures that changed the retirement requirements.   Under the new rules, when a K-9 retires, its handler has to go through re-certification before he or she can be given a new dog. (ECF 24, Exhibit 14).   According to Lamanna, Officer Cleaver (a white male K-9 officer) received a second dog and never had to repeat the qualification process. (ECF17-1, at 104).

When Lamanna was promoted to Sergeant in 2016 and would no longer be on the K-9 Unit, she was permitted to purchase her K-9, Raika, from the City for one dollar.   She was instructed by a former K-9 handler from the Narcotic Interdiction Unit, Anita Hauser, to "stock up on K-9 supplies prior to retiring the dog [because] all expenses, including medical expenses, are shouldered by the officer, and upon retirement, nothing is provided for the K-9 from then on." (ECF 26, ¶ 11).   Hauser told Lamanna this stocking up was done as a usual custom in the police

---

[1] Plaintiff's speculation about this person, like much of her Response, asserts as fact claims that are not supported by admissible Rule 56 evidence.

department and that it was "contrary to its normal practices" for the City to force an Officer to return those supplies. (Id. at ¶ 12).

After talking with Anita Hauser, Lamanna got a prescription filled for 12 months of Raika's worm medication at a cost of approximately $400. Now, Lamanna complains that Lt. Sheldon, during his deposition, called Lamanna a "thief" and "ridiculous" for getting this prescription filled. (ECF 24, at 89).

In 2016, after being promoted to Sergeant, Lamanna applied to Chief Biehl for the vacant position as the K-9 Sergeant that was going to be open since Eric Sheldon was being promoted to Lieutenant. (ECF 23, Exhibit 20). Lamanna had several years of patrol experience and experience as a K-9 Officer and had placed the highest on the Civil Service exam. Lt. Sheldon also explained that the K-9 Sergeant position is not one that is particularity sought after in the Department because "[i]t was a lot of extra work with no extra benefit." (Id. at 21). Sheldon explained that the primary duties were purchasing dog food and arranging for delivery, purchasing dogs, major equipment purchases, and scheduling trainings. (Id.). Each of the K-9 Officers had their own Patrol Sergeant that they primarily reported to for general administrative issues. (Id. at 22).

The K-9 Sergeant position was given to Randy Beane, a white male with no K-9 experience. Lamanna was told she was not considered for the position because she was still in her probationary period as a Sergeant and could not be promoted while on probation. (ECF 23, Exhibit 20). However, Sergeant Creigee Coleman testified via deposition that he has been asked to fill the K-9 Sergeant position previously though he was also still on probation, scored lower than Lamanna on the Sergeant's exam, and had no interest in dogs. (ECF 19, at 16). Coleman

testified that he was offered the position by either Lieutenant Dickie or Lieutenant Ponichtera, and Sgt. Gillick was also present. (Id.)

Lamanna points to witnesses whom, she believes, confirms that she felt resentment from the City. When asked if he has ever heard anyone express resentment or anger about Lamanna's position within the police department, Sergeant Creigee Coleman testified that there were some "overtures" and that some people "thought possibly that she was getting special treatment." Coleman said his response to those types of complaints was to tell them to just "deal with it." (ECF 19, at 21).

Sergeant Taylor testified that "a lot of people were really upset" when Lamanna was moved into day-shift downtown with weekends off after she was first given the K-9 position. (ECF 21, at 64). He noted that the details of Lamanna's schedule agreement with the City were known "all over the Department" and he lamented that there were "guys with 28, 29 years on that don't have that schedule." (Id.). Seniority amongst the officers is very important, according to Sergeant Taylor: "[w]e don't have a lot on this job as officers. You have seniority, and what I mean by that is seniority is really the only thing that counts. It gets you a nicer car, it gets you better days off, you know. It could maybe get you to day shift…" (ECF 21, at 65).

Lt. Sheldon testified that when Lamanna went downtown to work on days, "there were a lot of senior Officers that were displaced from a shift they could have worked because of that. So I'm sure there were some hurt feelings about that." (ECF 24, at 17). Lt. Sheldon also testified that no one on the K-9 Team or in the department that he knew of was given any discrimination or cultural sensitivity training. (ECF 24, at 33).

Lamanna filed an EEO complaint, and later opened this case. Her first claim alleges Sex Discrimination in violation of Title VII of the Civil Rights Act and Ohio Revised Code § 4112.02(A), charging Defendant with failure to promote, denial of training, denied leave time and discriminatory departmental policy changes. Plaintiff alleges that during her employment, similarly situated non-protected employees were treated more favorably than Plaintiff. She also alleges retaliation under Title VII of the Civil Rights Act and Ohio Revised Code § 4112.02 29. She lists as a Third Count Sex Discrimination/Retaliation Ohio Revised Code § 4112.99.

## II.    Standard

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and associated case law. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. at 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to

interrogatories, admissions and affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.*, at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S., at 250 (quoting Fed. R. Civ. at 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S., at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S., at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not…obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties.

III.    **Analysis**

## A. Discrimination

Title VII of the Civil Rights Act of 1964 prohibits federal agencies from employment discrimination "based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). It is a violation of Title VII to fail to promote an employee because of his or her membership in a protected class. See, e.g., *White v. Columbus Metro. Hous. Auth.,* 429 F.3d 232, 240 (6th Cir. 2005). Plaintiff asserts she was discriminated against because of her gender.

A plaintiff may establish a claim of discrimination either by presenting direct evidence of discrimination or by presenting circumstantial evidence that would support an inference of discrimination. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). Direct evidence is where an employer's statement directly shows discriminatory motive. See *Schlett v. Avco Fin. Servs., Inc.*, 950 F. Supp. 823, 828 (N.D. Ohio 1996). The Sixth Circuit stated in *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994), that evidence that would require the jury to infer a fact is not direct evidence. Direct evidence, in the form of verbal comments, will be similar to an employer telling its employee, "I fired you because you are disabled." *Smith v. Chrysler Corp.,* 155 F.3d 799, 805 (6th Cir. 1998). Plaintiff has no direct evidence that any of the actions of which she complains were motivated by race, leaving only the avenue utilizing circumstantial evidence established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973) to survive summary judgment.

Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), when a claim is based on circumstantial evidence, a plaintiff must first establish a *prima facie* case of discrimination, the elements of which vary slightly depending on the theory asserted. To establish

a *prima facie* case of discrimination based on a "failure to promote" theory, a plaintiff must demonstrate that:

> (1) she is a member of a protected class; (2) she applied for and was qualified for a promotion; (3) she was considered for and was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time plaintiff's request for the promotion was denied.

*White*, 429 F.3d at 240.    A plaintiff's burden at the *prima facie* stage is "not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

If the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for its adverse action.    If the defendant satisfies its burden, the burden shifts back to the plaintiff to identify evidence from which a reasonable jury could find that the stated reason is a pretext for discrimination.

Many of the incidents underlying Plaintiff's Title VII claims occurred more than 300 days prior to her June 24, 2015 EEOC/OCRC filing, and are thus time-barred.    In order to assert Title VII claims, a plaintiff must file a complaint with the EEOC/OCRC within 300 days after the alleged unlawful employment practice occurred. *Han v. University of Dayton*, 2012 WL 5576961 at *3 (S.D. Ohio December 21, 2012) citing *Delaware State College v. Ricks*, 449 U.S. 250, 257 (1980).   Failure to file within that period requires dismissal of the claims. Id.   Here, the only act which occurred within 300 days of the June 24, 2015 filing of her Charge with the OCRC involved the decision not to promote her off the eligible list and the decision (of the Civil Service Board) to grant her waiver request for the appointment due to her admitted five-year commitment to the K-9 unit.   Any claims regarding lack of a promotion before August 2014, however, are time-barred. Further, the only act claimed by Plaintiff regarding retaliation or being subjected to a hostile work

environment which occurred within the 300-day period involves her claim she had to submit a medical certification form for sick leave usage on February 25, 2015, and the situation involving her canine's retirement in 2015 or 2016, including the requirement she return the medication purchased by the City for her canine for several months after the retirement date.

As regards the failure to promote her off the eligibility list, a plaintiff who seeks to compare them self to other similarly situated employees, must show that these "comparables" are similarly situated "in all of the relevant aspects." See *Ercegovvich v. Goodyear Tire and Rubber Co.*, 154 F.3d 344 (6th Cir. 1988). Generally, similarly-situated employees must have dealt with the same supervisor, have been subject to the same standards, and have been engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. See *Mitchell v. Toledo Hospital*, 964 F.2d 577 (6th Cir. 1992).

Plaintiff's claims involving the 2015 wave of promotions to the rank of sergeant, including the promotion of Rich Taylor, fail because Plaintiff was not legally capable of performing the position in 2015. The second element of a *prima facie* case of employment discrimination requires the plaintiff to show that "she applied and was qualified for a job for which the employer was seeking applicants." *Thompson v. UHHS Richmond Heights Hosp., Inc.*, 372 Fed. App'x 620, 624 (6th Cir. 2010).

Here, Plaintiff could not perform the sergeant position in 2015 because she had agreed to a five-year commitment to remain in the canine handler position as part of an earlier complaint. She requested a waiver of appointment at that time, recognizing that was not qualified to fill that position. Likewise, Plaintiff also admits that, regardless of the Conciliation Agreement she

17

signed, she had a five-year commitment to the canine handler position, as stated in the original job posting for the position. Under that scenario, she still would not have been eligible for promotion until after October 2015. After October 2015, she was promoted to sergeant. As such, Plaintiff's claims involving the promotion to sergeant fail as a matter of law.

Plaintiff also cannot demonstrate that she was rejected in favor of a less-qualified similarly situated non-protected individual. In order to establish a *prima facie* case of circumstantial discrimination, a plaintiff must show that they were rejected in favor of a non-protected employee with similar qualifications. *White v. Columbus Metropolitan Housing Auth.*, 429 F.3d 232 (6th Cir. 2005). In particular, although the Plaintiff scored first on the promotional exam, Plaintiff has not established that she was "similarly situated" with the successful candidates.

The Sixth Circuit has consistently explained that in order to be considered "similarly situated" for purposes of creating an inference of disparate treatment, a plaintiff "must 'prove that all of the relevant aspects of his employment situation are 'nearly identical' to those of the [person outside of the protected category] who he alleges [was] treated more favorably." *Young v. Oakland County*, 176 Fed. App'x 644 (6th Cir. 2006); quoting *Pierce v. Commonwealth Life Ins.*, 40 F.3d 796, 802 (6th Cir. 1994).

Plaintiff was not similarly situated to Richard Taylor or others who were promoted to sergeant in 2015. This is because Plaintiff had executed the Conciliation Agreement, a legally binding document wherein she agreed to be in the canine position for a five-year period. No other individuals who were promoted were bound by such a conciliation agreement. Additionally, none of the individuals Plaintiff identifies were serving commitments in the canine unit. Richard Taylor's situation was also different than Plaintiff, as he could not have possibly fulfilled a

18

commitment to the forensics lab position because the lab closed. Considering these differences, the Court concludes Plaintiff is not similarly situated to the other candidates for sergeant and her discrimination claims involving the promotion fail as a matter of law.

Even if Plaintiff could establish a *prima facia* case of discrimination, the City of Dayton proposed a legitimate reason for not promoting Plaintiff in 2015. Whether or not Plaintiff's Conciliation Agreement could have been waived, the City relied upon it, believing it binding on them in their decision. Plaintiff has not established that the City's understanding of the five-year commitment rationale for not promoting Plaintiff was a pretext for discrimination. That reason had a basis in fact as Plaintiff signed the agreement and Plaintiff agreed she had a five-year commitment. An "after the fact" argument that some language in the CBA should have caused a different result does not change the fact that the City in early 2015 took the legitimate position that the Conciliation Agreement should be honored. Plaintiff has presented no evidence that that decision was motivated by gender. In fact, the City held a similarly situated employee, Officer Trupp, to the same five-year commitment before he was able to be promoted to Sergeant.

There is a process within the Civil Service Rules providing for a Waiver of Appointment. The waiver of appointment request to remain first on the list and be appointed at a later time, due to various reasons, can be made by the employee. The Chief of Police cannot force somebody to make such a request. However, in this case, it was clear in 2015 that, despite Plaintiff scoring first on the test, she could not be promoted due to her five-year commitment. In this case, the evidence clearly shows that the reason Lamanna requested the waiver of the appointment at that time was due to her obligations under the Conciliation Agreement. The Dayton Civil Service

Board determined that it would grant her waiver, and that it could not appoint her in 2015 due to the Conciliation Agreement.

The waiver request was granted by the Civil Service Board and the waiver was effective until January 24, 2016. See, Lamanna Deposition at 54-55, and Exhibit D and E. Plaintiff therefore could not be promoted until after January 24, 2016. Lamanna Deposition at 55. Plaintiff, in fact, was promoted at the first opportunity after January 24, 2016 and was promoted to Sergeant in February of 2016. Id.

Finally, Plaintiff discusses her denial of becoming a Canine Sergeant. This claim is not at issue in this lawsuit. It was not part of her 2015 charge with the Ohio Civil Rights Commission. As the decision to appoint a Canine Sergeant occurred in 2016, that claim for "failure to promote" is also now time barred. Thus, Plaintiff's Title VII failure to promote claim fails.

**B.      Hostile Environment**

To prevail on a hostile work environment claim, a plaintiff must establish that: "(1) she belonged to a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on gender; (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act." *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011). To determine whether conduct is actionable, a court must consider the totality of the circumstances "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Harassment is "based on race when it would not have occurred but for the

plaintiff's [protected class]." *CSX Transp. Co.*, 643 F.3d at 511. While harassing conduct need not be overtly prejudiced to qualify, a plaintiff must produce either "(1) direct evidence of the use of [protected class]- specific and derogatory terms or (2) comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace." Id. Plaintiff has no evidence of a hostile work environment or racial animus directed toward Plaintiff.

Plaintiff's allegations are insufficient to establish a hostile work environment claim. "The touchstone of a hostile work environment claim is proof that 'the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *McCoy v. Mv Residential Property Management, Inc*., 2016 WL 1392483 at *4 (S.D. Ohio April 8, 2016). "The standards for judging hostility are sufficiently demanding in order to ensure that Title VII does not become a "general civility code." *Faragher v. Boca Raton*, 524 U.S. 775, 787-88 (1998). When properly applied, these standards filter out complaints which attack "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." Id. at 788. Conduct must be extreme to constitute a change in the terms and conditions of employment." Id.

Courts should look at the following criteria in order to determine if the work environment is sufficiently hostile to support a claim: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with the employee's work performance. *Faragher v. Boca Raton*, 524 U.S. 775, 787-88 (1998). None of these criteria support the Plaintiff's claim.

A hostile work environment occurs "when the workplace is permeated with 'discriminatory intimidation, ridicule, and insult'" that it is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986). "Courts must be mindful of the need to review the work environment as a whole, rather than focusing single-mindedly on individual acts of alleged hostility" *Williams v. General Motors Corp.*, 187 F.3d 553, 563 (1999).

First, the alleged hostile conduct was infrequent. In the course of almost six years of employment Plaintiff alleges a handful of incidents over six years. The incidents involve denial of training and leave requests, application of a canine retirement policy to Plaintiff, "messing" once with Plaintiff's dog and an informal investigation of a potential biting incident. None of these incidents have been shown by Plaintiff to have unreasonably interfered with Plaintiff's work performance.

Second, the alleged conduct was not severe. The required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct. *Sublett v. Edgewood Universal Cabling Systems, Inc.*, 194 F.Supp.2d 692, 703 (S.D. Ohio 2002). *Novotny v. Elsevier*, 291 F. App'x 698, 703 (6th Cir. 2008); *Thomas v. Potter*, 93 F. App'x 686, 688 (6th Cir. 2004).

Here, the alleged actions are not frequent, and are not sufficiently severe. They fall within the boundaries of the ordinary tribulations of the work place, and are insufficient to support a hostile work environment claim. Plaintiff has not adduced proof of a workplace so permeated with discriminatory intimidation, ridicule, and insult that it is sufficiently severe or pervasive to

alter the conditions of Plaintiff's employment. See *McCoy v. Mv Residential Property Management, Inc*., S.D. Ohio, 2016 WL 1392483 at *4.

First, Plaintiff has not produced any evidence that she was subjected to conduct that was so severe or pervasive that it altered the conditions of her employment. Plaintiff alleges she has been harassed in the form of being denied training. On July 16, 2013, Plaintiff requested to attend a Canine Evaluator Training. Lamanna Deposition Exhibits I and J. The training was denied, after consultation with the canine supervisor at the time, Sgt. John Sullivan, who advised that there was no requirement to have an OPOTA canine evaluator on the Dayton Police Department. Id. Thus, the training was denied as it was unnecessary. Further, Plaintiff suffered no tangible adverse effect in her job as a result of not attending this training. On March 12, 2014, Plaintiff made a request to travel to and attend an International Police Work Dog Association Training Workshop in May of 2014. Lamanna Depo at 76 and Exhibit H attached thereto. The estimated cost of the training was over $1,000 and involved being away for six days. No officers were granted that training request and Plaintiff admits there is no evidence the denial was based upon Plaintiff's gender. Lamanna Depo at 77-78.

The other training request was for the Basic Humane Agent Training at the Ohio Peace Officer Training Academy. Lamanna Depo at 84-86 and Exhibit K. There was a $150.00 registration fee and a per diem of $150.00. After determining that the training would result in the attendee being sworn in as an Ohio Humane Agent, whose responsibilities involve doing follow-up investigations on animal cruelty cases, it was determined the training was not applicable to an officer's position in the department. Accordingly, the request was denied. Id. Plaintiff

acknowledges that over the years she was granted training opportunities and denied requests only a few times. Lamanna deposition at 84.

Plaintiff also alleges she was harassed by being required to submit medical certification forms when absent from mandatory training sessions. Mandatory training dates for the entire 2014 year, occurring on two Wednesdays per month, were published in a Special Order dated November 27, 2013. Lamanna Deposition at 88 and Exhibit L. The only exceptions to having to attend mandatory training sessions are pre-approved vacation; sick leave, funeral leave, or out of town training. Id. at 88-90 and Exhibit M. On occasions, individual officers, including Plaintiff, have also used "comp time" when missing mandatory training. Sheldon Deposition at 36-52, and Exhibits 9-11. Regardless, however, Plaintiff also acknowledges that the use of sick leave on a mandatory training day does require the submission of a medical certification form by the employee. Lamanna Deposition at 91.

Notwithstanding the fact that an April 23rd training date had been set so well in advance, Plaintiff made a request on March 27, 2014 to be on "vacation" on April 23, 2014, citing the need to have a medical procedure. Id at 91-92 and Exhibit N. Although the vacation day was approved by her regular duty Sergeant, Sgt. Abney, it was later rescinded as a new vacation leave day request was not a valid reason to miss a previously set mandatory training date. Id. Plaintiff nevertheless called off sick on April 23 and April 24, 2014 and did not attend the mandatory training. Id. Because she called in sick on a mandatory training date, and because she had been denied vacation for that date, a medical certification was requested in accordance with policy. Id. Other individuals in the canine unit, both male and female have been required to submit medical

certification forms when missing mandatory training due to use of sick leave. Sheldon Deposition at 48-50.

The next time Plaintiff was required to submit a medical certification form was for sick leave usage on February 25, 2015. Lamanna Deposition at 99-101 and Exhibits P and Q.  Another Special Order, dated December 19, 2014, had been issued with the mandatory training dates for 2015 approved and published by the Chief of Police. Id.  Nevertheless, Plaintiff asked that the hours for the training be changed on February 25, 2015 due to a court appearance. Sheldon Deposition at 55-57.  Sgt. Sheldon advised Plaintiff he could not change the hours of the training and that it should not affect her court appearances. Id.  Plaintiff however, again did not attend the training and called off sick and remained off sick for three days, returning on February 28th, 2015. Id.  Again, because sick leave was taken on a mandatory training date, Plaintiff was required to provide a medical certification upon return to work. Id.

The only other allegation in the Complaint of Plaintiff being harassed, discriminated or retaliated against involves the department's handling of canine retirements.  The department has had a long-standing canine policy that has not changed.  However, in January of 2015 a Statement of Policy ("SOP") was created and ultimately issued in February 2015. Sheldon Deposition at 84-97.  The SOP addresses the retirement of canines, but does not set any certain age limit by which that must occur.  The SOP states that canine retirement will be based upon canine health, ability to perform, and age, with the final decision to be made by the Chief of Police.  Once a canine handler's canine is retired, the canine officer, with the approval of the Police Chief, may repeat the selection process to ensure they still meet the qualifications and are best suited for the assignment. Id.

Nothing in the SOP or any policies or procedures involving the retirement of canines affected Plaintiff in any manner or disqualified her from continuing to be a canine officer or which mandated that her canine be retired. In fact, Plaintiff was promoted to Sergeant. She was able to purchase and keep her canine, consistent with the policies and the SOP in the department. What she was not permitted to do was keep the City-owned property, i.e. equipment, and many months' worth (approximately $350) of veterinary medications, which had been purchased by the City and which she planned to use after she had purchased the canine. Id. Sgt. Sheldon specifically requested that that unused medication and other equipment, etc. be returned to the City upon her promotion and exit from the canine unit. Id.

There are two additional events not raised in her Complaint or OCRC Charge, that Plaintiff claims subjected her to a hostile work environment. First, she claims that fellow employees, Mike Lally and Dan Zweisler, "messed" her dog up during in-service training exercises, causing her to have to do a refresher course with her dog. Lamanna Deposition at 110. She claims during tracking exercises the other handlers would pull her dog off in the wrong area to deter her from doing what she was supposed to do. Id. Plaintiff also felt that training sessions were changed to afternoons and nights as a way of harassing her. Id.

Finally, Plaintiff cites an incident during training in which Plaintiff had slobber and drool on her pants, and there was a concern of other handlers that the dog had bitten Plaintiff. Id. at 114-118. As a result, Sergeant Sheldon had a female sergeant accompany Plaintiff to the restroom to look at her legs to see if the dog had broken the skin of Plaintiff and bit her during the training. Id. Sheldon Deposition at 69-75. Neither of these arguments rise to the level of harassment which constituted a hostile work environment. With regard to the training of the dog, Plaintiff suffered

no damages as a result of the retraining of her canine and there is no evidence that the handlers intentionally took actions against Plaintiff's canine due to Plaintiff's gender. Further, Plaintiff acknowledged that a K-9 potentially biting her handler during training is a legitimate issue which needs to be reported and addressed and the actions taken by Sergeant Sheldon to allow plaintiff to privately do so in a restroom with somebody he felt would be appropriate to observe potential injuries is not an act of harassment which would support a hostile work environment claim.

None of the events of which Plaintiff complains, nor all of them considered together are so "extreme to constitute a change in the terms and conditions of employment." *Faragher v. Boca Raton*, 524 U.S. 775, 787-88 (1998); *Williams v. General Motors Corp.*, 187 F.3d 553, 563 (1999). Thus, Plaintiff's Title VII harassment claims will be dismissed.

## C.     Retaliation Claim

Title VII forbids employer actions that discriminate against an employee because the employee participated in protected activity, such as an EEO investigation. *Burlington N. & Santa Fe Ry. Co v. White*, 548 U.S. 53, 59 (2006). Where a plaintiff relies on indirect evidence to establish his claim, the familiar *McDonnell-Douglas* burden-shifting framework applies. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that: "(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." Id. To satisfy the third prong, the plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker

from making or supporting a charge of discrimination." *Burlington N. Ry.*, 548 U.S. at 67-68 (internal quotation omitted). The standard is objective and does not protect a plaintiff from trivial harms, such as petty slights, minor annoyances, and a simple lack of good manners, which are not likely to deter victims from complaining to the EEOC. Id. at 68.

Here, Plaintiff's retaliation claims are based on the same events that she uses to support her harassment claim. None of the events, nor all of them considered together should "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington N. Ry.*, 548 U.S. at 67-68 (internal quotation omitted). Thus, Plaintiff's Title VII retaliation claims fail as well.

## IV.    Conclusion

Because Plaintiff has no direct evidence of discrimination and because much of the conduct Plaintiff decries either predates her EEOC complaint, or were not contained in it, and because Plaintiff was initially not qualified for promotion, is not similarly situated to individuals who were treated differently, cannot disprove Defendant's stated non-discriminatory reasons as pretext, and because the actions Plaintiff decries do not amount to a hostile work environment, and because the actions Plaintiff decries would not dissuade a reasonable worker from making or supporting a charge of discrimination, Defendant's Motion for Summary Judgment, ECF 30, is **GRANTED** with regard to Plaintiff's Title VII claims.

Plaintiff's remaining claims are based on state law. The court notes that it has discretion to hear or dismiss state claims after the federal claim has been dismissed, pursuant to 28 U.S.C. § 1367(c)(3), but declines to exercise this jurisdiction. See *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) (noting that generally "if the federal claims are dismissed before trial, ... the state

claims should be dismissed as well").   The Court declines to exercise its supplemental jurisdiction over Plaintiff's state law claims because they are better addressed by an Ohio state court, as they are based in Ohio state law.   Therefore, Plaintiffs' **STATE LAW CLAIMS** are **DISMISSED WITHOUT PREJUDICE** to refiling in state court.

The captioned cause is hereby **TERMINATED** upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.   **DONE** and **ORDERED** in Dayton, Ohio, this Wednesday, October 17, 2018.


s/Thomas M. Rose
_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE